**Maurice L. HUDGINS, Plaintiff,**

v.

**Christian DeBRUYN, et al., Defendants.**

**Steven C. BLAND, Plaintiff,**

v.

**Christian DeBRUYN, et al., Defendants.**

**Nos. IP–93–1075–C–T/G,**
**IP–93–1131–C–T/G.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 5, 1996.

Hamid R. Kashani, Indianapolis, Indiana, for Plaintiff.

Thomas D. Quigley, Deputy Attorney General, Indianapolis, Indiana, for Defendant.

## ENTRY OF FINDINGS OF FACT AND CONCLUSIONS OF LAW AND DIRECTING ENTRY OF JUDGMENT

TINDER, District Judge.

These actions came before the court on May 5 and 6, 1995 for trial. The plaintiffs were present in person and by counsel, and the defendants were present by counsel. The evidence was submitted and concluded.

Whereupon the court, having considered the pleadings, the record prior to trial and the evidence, and being duly advised, now makes its findings of fact and conclusions of law, all pursuant to *Fed.R.Civ.P.* 52(a):

### I. Findings of Fact [1]

1. Plaintiff Steven Bland ("Bland") is a prisoner of the State of Indiana serving a sentence imposed by the Marion County Superior Court, Criminal Division. He is currently confined at the Indiana Reformatory. Plaintiff Maurice Hudgins ("Hudgins") is a

---

1. Certain issues of fact cannot be resolved in this case without making a determination of which version of the pivotal events was more credible. In making this and other determinations as to contested issues, the court has considered the customary factors associated with credibility— demeanor, detail, consistency, opportunity to observe or perceive the events testified to, matters affecting credibility, etc. It has not relied solely on the number of witnesses who related a particular event or on any other single factor.

convicted offender who was formerly confined at the Reformatory.

2. The defendants in this action are (i) Christian DeBruyn, Commissioner of the Indiana Department of Correction ("the DOC"), (ii) W. Dean Neitzke, the Director of Health Care Service for the DOC, (iii) Jack Duckworth, the Superintendent of the Indiana Reformatory, (iv) Jack Weist, the Assistant Superintendent for Programs at the Indiana Reformatory, (v) Mauro Chavez, the Medical Director and Chief Physician at the Indiana Reformatory, (vi) James F. Knopp, the Health Care Administrator at the Indiana Reformatory, (vii) Randy Cawthorne, the Commissary Supervisor at the Indiana Reformatory, (viii) Kenneth Smith, the Chief Pharmacist at the Indiana Reformatory, and (ix) Lynn Henthorn, a nurse at the Indiana Reformatory.

3. Commissioner DeBruyn issued an Executive Directive, identified as No. 93–12, on May 17, 1993 ("the OTC Policy"). Through the OTC Policy, the DOC modified the manner in which convicted offenders such as Bland and Hudgins could access certain over-the-counter ("OTC") medication. Previously, OTC medication was dispensed by medical personnel in conjunction with a prisoner's utilization of the sick-call process. With the adoption of the OTC Policy, however, the logistics and philosophy of supplying OTC medication changed. A copy of the OTC Policy, which was introduced at trial as plaintiffs' Exhibit 1, is attached to this Entry as Exhibit A.

4. A Health Care Services Directive of the DOC, identified as No. HCS–93–7 ("the Directive"), was issued in conjunction with the OTC Policy. This Directive first acknowledges the DOC's obligation to "provide health care services necessary to treat serious medical conditions." It then explains:

> The Department of Correction will not provide health care services which can be classified as for cosmetic, convenience, or general hygiene purposes, or which address minor symptoms which do not carry with them significant morbidity or mortality.

The Directive dictates that offenders seeking OTC medication be referred to the institution commissary, where the items will be stocked and available for the offenders' purchase at the DOC's cost. The Directive includes a non-exhaustive list of specific items or types of items which will no longer be provided by the health care staff. The Directive proceeds to explain certain exceptions to the foregoing. These exceptions include OTC medication which is dispensed "as part of a necessary treatment regimen for a serious medical condition" or "when an offender is an inpatient." A copy of the Directive, which was introduced at trial as plaintiffs' Exhibit 2, is attached to this Entry as Exhibit B.

5. The purpose of the Directive was to implement the OTC Policy. The purpose of the Policy was to reduce the DOC's expense in providing OTC medication, while still maintaining inmate access to such medication. The shift, generally speaking, was two-fold: first, the Directive provided that OTC medication would generally no longer be available free of charge; and second, the Directive provided that OTC medication would generally be purchased from the institution commissary. The Directive identified the OTC medication which would be stocked by the commissary at each institution. Additionally, as measures to minimize the expense inmates would incur in purchasing OTC medication, the OTC Policy provided that OTC medication would be sold to inmates "at cost" and that "[w]hen possible, generic preparations, inexpensive packaging, quantity purchases, etc.," would be used.

6. Inmates were informed of the change wrought by the OTC Policy and its related Directive. The change was effective June 15, 1993.

7. Successfully implementing the OTC Policy required coordination, the development of supplemental information and adjustment. These steps took time. During this time, offenders lacked access to a consistent supply of the full spectrum of OTC medication which was specified in the Directive. The commissary supervisor was responsible for securing and maintaining stocks of OTC medication. This task was more complex than that presented to a person unrestrained by prison walls who could stroll

to a nearby pharmacy and pluck items from well-stocked shelves.

8. Prior to June 15, 1993, each plaintiff had an established record of seeking and receiving OTC medication from the medical staff, via the sick-call procedure.

a. Specifically, Hudgins was prescribed and provided with (a) Pepcid, 20 mg. per day (or Zantac, 40 mg. per day) for the treatment of his ulcer and (b) Maalox, as needed, for the treatment of heartburn. Additionally, Hudgins was prescribed Preparation H and a legend fiber laxative, on demand, as needed for his hemorrhoids, as well as Pseudoephedrine (the chemical name for Sudafed) on demand, as needed for his sinus problems. Subsequent to the implementation of the OTC Policy, the defendants denied Maalox and anti-hemorrhoidal medications to Mr. Hudgins even though he had been prescribed these medications for many years before the implementation of the Directive.

b. Prior to June 15, 1993, Bland had been provided with three medications for his asthma and associated symptoms: Theophylline 300 mg. per day; Pseudoephedrine 60 mg., twice per day; and a Metaproterenol Sulfate Inhaler, as needed. Tylenol, 325 mg. per day, had also been prescribed for Bland, for the pain caused by his arthritis. On occasions, such as humid days, when the arthritis pain worsened, Mr. Bland was prescribed and provided with Tylenol Extra Strength, 500 mg., on demand.

9. After implementation of the OTC Policy its associated Directive, Bland was seen by Dr. Chavez. Dr. Chavez refused to issue him a prescription for Pseudoephedrine. Since 1988, Dr. Chavez and other Reformatory doctors, as well as outside specialists, had routinely prescribed Pseudoephedrine for Bland in order to treat his asthma and its associated symptoms. Since the implementation of the OTC Policy and the Directive, Chavez had instructed Bland to purchase Pseudoephedrine from commissary. On one occasion, in December of 1993, however, Dr. Chavez prescribed some Pseudoephedrine for Bland. He did this because he, Chavez, "got into the Christmas spirit."

10. After implementation of the OTC Policy, Bland and Hudgins had mixed success in obtaining OTC medication with which they were formerly provided by the medical staff: Bland and Hudgins were not able to obtain this without cost, generally speaking; they were only able to obtain it through the specific procedures for making commissary purchases; they were only able to obtain it in limited quantities; and, most importantly, they were only able to obtain it when the commissary had it in stock. No defendant, however, either designed or implemented the OTC Policy for the purpose of causing the plaintiffs to suffer or to perpetuate, extend or intensify their suffering. Nor has any defendant acted with the knowledge that the OTC Policy or the manner in which the Reformatory staff implemented it constituted an excessive risk to inmate health or safety.

11. The plaintiffs, and particularly plaintiff Bland, were not entirely destitute and unable to engage in their own commissary transactions following the institution of the OTC Policy.

a. Bland is employed as a clerk in the Reformatory law library. He generates sufficient revenue from that employment to undertake regular purchases from the institution commissary and to occasionally send money out for his son. The fact that he is proceeding *in forma pauperis* in this action is not indicative of his indigence over an extended period of time in relation to making modest purchases and other expenditures. His commissary transactions for the period of time after the OTC Policy went into effect show that he made purchases of Pepsi, coffee, dried beans, pies, popcorn and chewing gum, in addition to OTC medication.

b. Bland also experienced moderate success in "stockpiling" OTC medication, although this was contrary to institution policy. He did this by bartering among the inmate population for OTC medication. This was achieved by using food and cigarettes as a form of currency.

c. Hudgins testified that he had essentially learned to live with the stomach discomfort, although that was in fact chronic. Some amelioration of his gastro-intestinal

distress occurred through the regulation of his diet. Hudgins also received screening for his complaints, treatment of viral or bacterial infections, occasional treatment for his ulcers and treatment for extensive nasal and head congestion.

d. Just as has Bland, moreover, Hudgins also expended his own funds for purchasing miscellaneous food items, soap, skin cream, and tobacco, as well as OTC medication. His pay at the Reformatory was more meager than that of Bland, but he had some funds available with which to make these purchases.

12. After implementation of the OTC Policy, Dr. Chavez and other members of the medical staff continued to screen and diagnose medical concerns of the plaintiffs. They also continued to treat the plaintiffs (or arrange for other diagnostic procedures) in a manner consistent with the staff's professional judgment. Dr. Chavez continued to prescribe medication for the treatment of serious medical conditions or needs. The medical records of each plaintiff during this period of time are extensive. The plaintiffs had continued access to the medical staff for the purpose of assessing the plaintiffs' complaints and conditions and responding to them as the staff's judgment and the circumstances dictated.

13. There is a line to be drawn between the medical conditions or complaints which warrant medical treatment at the Reformatory and those which present what are essentially options for the inmate in terms of seeking relief or not. On the former side of this line are conditions such as occasional indigestion or constipation, dandruff, acne, vitiligo, chapped lips, dry hands, most headaches, most colds (uncomplicated with fever or purulent mucous production), and muscle ache from exertion. These are conditions which dictate a response, "treatment," for cosmetic purposes or purposes of convenience or comfort. On the other side of the line are serious medical needs. The DOC, through the OTC Policy, has characterized this latter group of conditions as those which "carry with them significant morbidity or mortality." The Medical Director of the DOC, Dr. Dean Rieger, testified that mortali-

ty has to do with death, while morbidity refers to the existence of significant ill effects from a condition.

14. Any conclusion of law, to the extent that it represents a finding of fact, shall be construed in that fashion.

## II. Conclusions of Law

Based on the foregoing Findings of Fact, the court now makes the following Conclusions of Law:

1. The plaintiffs' action is brought pursuant to 42 U.S.C. § 1983. A cause of action is provided by 42 U.S.C. § 1983 against

> every person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

Subject matter jurisdiction over the action is based on 28 U.S.C. § 1331(a) and 28 U.S.C. § 1343(a)(3).

2. To state a claim under § 1983, a plaintiff must allege (1) that he was deprived of a right secured by the Constitution or laws of the United States and (2) that the deprivation was caused by a person acting under color of state law. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155–56, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978). Absent either element, a claim will not be stated.

3. The presence of state action is evident here from the pleadings and the testimony. The first element, therefore, is present. Whether the second element is present is crucial, however, for without a predicate constitutional violation one cannot make out a prima facie case under § 1983. *Juriss v. McGowan,* 957 F.2d 345, 349 n. 1 (7th Cir. 1992), citing *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).

4. The first step in determining the validity of the plaintiffs' § 1983 claims is to identify the specific constitutional violations alleged. *See Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Clarity in identifying the precise constitutional right implicated in specific cases is of paramount importance in analyzing a claim

under § 1983. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). Whether a constitutional violation has occurred can only be determined by applying the standards applicable to that particular constitutional provision. *Id.*

5. "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 84–85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Nonetheless, "prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. at 84, 107 S.Ct. at 2259. This case draws into question whether Indiana authorities have crossed that line.

6. There are many lawsuits in the federal courts today challenging the treatment of prisoners. These suits are brought to vindicate the existence and importance of fundamental constitutional rights, which is the price society pays for depriving those convicted of crimes of their liberty. *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 197, 109 S.Ct. 998, 1004–05, 103 L.Ed.2d 249 (1989) ("in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals").

7. Bland and Hudgins are convicted offenders. "It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993). When a claim is asserted that particular conditions or treatment violate the Eighth Amendment's proscription against cruel and unusual punishment, § 1983 is a means by which prisoners may gain redress for conditions which "result[ ] in unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981).

8. The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Farmer v. Brennan*, —— U.S. ——, ——, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994). Hence, pursuant to the Eighth Amendment, prison officials have a duty to "provide humane conditions of confinement; ... [to] ensure that inmates receive adequate food, clothing, shelter and medical care, and [to] 'take reasonable measures to guarantee the safety of the inmates[.]' " *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)).

9. Prison officials have a duty to ensure that inmates receive adequate medical care. *Farmer*, 114 S.Ct. at 1976. In order to impose liability, however, an inmate must demonstrate that the official was "deliberately indifferent" to the inmate's health. *Id.* at 1979; *Del Raine v. Williford*, 32 F.3d 1024, 1036 (7th Cir.1994).

a. Deliberate indifference exists only when an official "knows of and disregards an excessive risk to an inmate's health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, —— U.S. at ——, 114 S.Ct. at 1979 (construing *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Mere negligence or medical malpractice do not constitute deliberate indifference. *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir.1994) (citing *Duckworth v. Franzen*, 780 F.2d 645, 652–53 (7th Cir. 1985)). There is no room in this branch of constitutional jurisprudence for imposing liability on a defendant for harm suffered as the result of something a defendant "should have known." *Miller v. Neathery*, 52 F.3d 634 (7th Cir.1995) (explaining that *Farmer* opted for the criminal law standard of recklessness to give meaning to Eighth Amendment standard of "deliberate indifference").

b. A medical condition is deemed to be serious if it may be "life threatening or pose[s] a risk of needless pain or lingering

disability if not treated at once." *Davis v. Jones,* 936 F.2d 971, 972 (7th Cir.1991).

■ 10. It is clear from the foregoing that the duty to provide a certain level of health care to incarcerated offenders under the Eighth Amendment is a limited one. Generally, federal courts are averse to injecting themselves into day-to-day prison administration and management. *See, e.g., Hewitt v. Helms,* 459 U.S. 460, 474, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983); *Rhodes v. Chapman,* 452 U.S. 337, 351–52, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Meriwether v. Faulkner,* 821 F.2d 408, 417 (7th Cir.1987), *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). The Constitution does not forbid experimentation in the prison setting, a point recently made in *Oliver v. Deen,* 77 F.3d 156, 161 (7th Cir.1996):

> [T]his case is about what the Constitution requires. Recently, in another prisoner case, *Anderson v. Romero,* 72 F.3d 518 (7th Cir.1995), we noted that "the Eighth Amendment forbids cruel and unusual punishments; it does not require the most intelligent, progressive, humane, or efficacious prison administration." Mr. Oliver's complaint seeks to involve us in the sort of "micromanagement" of a state prison that we deplored in *Anderson.*

It is against this background, both constitutional and practical, that the court now undertakes an assessment of the plaintiffs' claims.

■ 11. The OTC Policy was examined, albeit in a different procedural posture, by Judge Miller of the Northern District of Indiana in *Martin v. DeBruyn,* 880 F.Supp. 610 (N.D.Ind.1995). Judge Miller reviewed both the general Eighth Amendment principles which have already been discussed here, and the specifics of the OTC Policy. He conclusion was one with which this court is in agreement:

> [T]he court concludes that a prison official violates the Eighth Amendment by refusing to provide prescribed OTC medicine for a serious medical need only if the inmates lacks sufficient resources to pay for the medicine. If the inmate can afford the medicine but chooses to apply his resources elsewhere, it is the inmate, and not

the prison official, who is indifferent to serious medical needs.

*Id.* at 615.

12. The Supreme Court discussed a municipality's liability for the cost of medical care provided to a pretrial detainee in *Revere v. Massachusetts General Hospital,* 463 U.S. 239, 245 n. 7, 103 S.Ct. 2979, 2984 n. 7, 77 L.Ed.2d 605 (1983), but noted that its holding did not "affect[ ] any right a hospital or governmental entity may have to recover from a detainee the cost of the medical services provided to him." Judge Miller thought that the OTC Policy was consistent with this open door for recoupment of costs.

13. The OTC Policy, in fact, is the first cousin to the "co-pay" policy which was challenged in *Johnson v. Department of Public Safety and Correctional Services,* 885 F.Supp. 817 (D.Md.1995). The co-pay policy challenged in *Johnson* was a policy which implemented a Maryland statute authorizing prison officials to assess a "reasonable fee not to exceed $4 for each visit by a prisoner to a medical unit...." MD.CODE ANN. Art. 41, § 4–104. The policy did so by charging inmates two dollars ($2.00) for certain non-emergency medical services available at the prison facility. The stated purpose of the policy was to reduce abuse of the sick call system, to promote inmate responsibility for their own health, and to allow facility medical resources to be used more efficiently. *Id.,* 885 F.Supp. at 818.

14. The court in *Johnson* followed the same analysis as undertaken in *Martin* and in this case. The conclusion was this:

> This Court has no hesitation in concluding that the Defendant's co-pay policy does not represent "intolerable" treatment that "shocks the conscience." The policy is flexible and makes a wide variety of exceptions to avoid imposing unnecessary hardship on seriously or chronically ill prisoners. In light of the numerous exceptions, it appears that the only inmates likely to be subjected repeatedly to the co-pay requirement are those who overuse prison medical services with frequent visits for minor complaints. Moreover, because the policy mandates that no one shall be re-

fused treatment for an inability to pay, the co-pay policy will not result in a denial of care, even for inmates who abuse the system.

This Court is not the first to conclude that co-pay requirements for prison medical services are constitutional. Similar policies have been challenged and upheld under the Eighth Amendment. *See Shapley v. Nevada Bd. of State Prison Comm'rs,* 766 F.2d 404, 408 (9th Cir.1985) (prisoner had alleged no facts sufficient to support allegation that $3.00 fee for medical visits represented deliberate indifference). *Compare Collins v. Romer,* 962 F.2d 1508, 1514 (10th Cir.1992) (affirming district court finding that statute which contained no exceptions whatsoever to co-payment requirement would be unconstitutional because it would deprive prisoner of meaningful access to health care).

*Johnson,* 885 F.Supp. at 820.

■ 15. The OTC Policy of the Indiana DOC has the same pivotal safeguard as highlighted in *Johnson.* That is, it provides that medical personnel will continue to prescribe OTC medication where a condition warrants that course of treatment. The fact that it limits such conditions to serious medical needs does not offend the Constitution. "Under the health care services directive, the existence of a serious need determines whether inmates receive free OTC medications. Inmates with a serious medical condition and OTC medication prescribed by a physician as part of the treatment are to receive them for free; all others are not." *Martin,* 880 F.Supp. at 613. The OTC Policy thus places indigent inmates at a disadvantage, but this is the result of their poverty, not the result of the Policy. The consequence, in any event, is not unconstitutional because the inmate's serious medical needs are met, whether the inmate is indigent or not, and whether the proper manner in which to meet the needs is by the use of legend drugs, OTC medication, or otherwise.

16. Based on the foregoing, the court finds that the plaintiffs have neither by design nor in practice been denied "the minimal civilized measure of life's necessities" in relation to a humane and adequate system of health care. The OTC Policy does not attempt to narrow the "serious medical need" component of a viable Eighth Amendment claim under *Estelle.*

■ 17. This leaves for discussion whether the manner in which the OTC Policy was implemented was violative of the rights of these plaintiffs. It was not, for even if certain of their chronic and significant ailments crossed the line into "serious medical needs," the occasional failure of the Reformatory to have appropriate OTC medication available for them was the result of inadvertence. As with any closely monitored situation over several years (the length of time sought to be drawn into the fray in this case by each plaintiff), there are a plethora of individual circumstances which pertain to each inmate's custody. Nor surprisingly, these include aspects of their ailments and the responses, if any, of the institution medical staff. Some of these are highlighted in paragraphs 8 through 12 of Part I of this Entry. It is unnecessary to further chronicle these individual circumstances, for the sum and substance of the matter is that implementation of the OTC Policy has been only partially successful as to that portion of the Policy which contemplated that the Reformatory commissary would be an adequately supplied substitute source for OTC medication. It has, however, forced Bland and Hudgins, along with other inmates, to face up to decisions about how to spend their limited funds, how to make limited supplies of OTC medication last until replenished, and how to adjust their purchases so as to maximize their access to OTC medication when needed most. These decisions and adjustments, just as the fact that OTC medication is now exclusively available from the Reformatory commissary, rather than from diverse staff member as previously, are merely issues of convenience.

18. Far from the systematic and barbaric policy which the plaintiffs portray, the OTC Policy is a thoughtful and serious effort to provide necessary medical services in a reasonable fashion. The effort is supported by precisely the same rationales as in *Johnson,* which is to say that it is intended "to reduce abuse of the sick call system, to promote

inmate responsibility for their own health, and to allow facility medical resources to be used more efficiently." *Johnson,* 885 F.Supp. at 818. The effort is further supported by the DOC's desire to provide a consistent staff response to inmates' concerns, and particularly those related to serious medical needs. Lastly, no profit motive is reflected in the Policy; to this extent, therefore, inmates subject to the OTC Policy are in a better position than comparable consumers outside the prison walls.

19. It is no constitutional criticism of the OTC Policy that it was not undertaken after something akin to consumer research; nor is it a constitutional infirmity if the OTC Policy proves to be less cost effective that hoped; nor that it ultimately yields to some other arrangement. The only inquiry which the court is justified in making in this case is whether the OTC Policy falls short of the very broad reach of the Eighth Amendment. It does not. Accordingly, the plaintiffs are not entitled to recover in this action, whether as to the claims for damages they each present or as to the claim for injunctive relief which was extant at the time of trial only as to Bland. The defendants shall prevail in this action, and judgment consistent with this Entry shall now issue.

20. The court compliments counsel for all parties for their thorough presentation of evidence and the explication of the issues and law rendered on behalf of their clients. The court continues to value representation of this high caliber. Such representation both aids in the resolution of the particular case under consideration and serves as a model for the legal profession.

**IT IS SO ORDERED.**

EXHIBIT A

INDIANA DEPARTMENT
OF CORRECTION

E334 Indiana Government Center South

302 W. Washington St.

Indianapolis, IN 46204

(317) 232–5715

May 17, 1993

EXECUTIVE DIRECTIVE: # 93–12

This Executive Directive concerns the manner in which offenders obtain items which have formerly been obtained through sick-call and access to health care processes. Effective June 15, 1993, offenders will no longer be able to utilize sick-call/access to care processes in order to obtain over-the-counter items used for cosmetic, general hygiene, general comfort or convenience purposes. Instead, these types of items are to be made available to the offenders through the offender commissary.

Attached to this Executive Directive is a list of items (or type of items) that will no longer be provided by Health Care Staff, but are to be purchased through the offender commissary process. These items are to be obtained through the normal process to obtain commissary items; however, they may be sold to the offenders at cost and are not required to have the same mark-up as indicated in Policy 02–01–108, "The Establishment and Operation of Commissaries." When possible, generic preparations, inexpensive packaging, quantity purchases, etc., are to be used in an attempt to keep the cost down for the offenders.

An exception is provided when an offender can use an over the counter medication as part of a necessary treatment regimen for a serious medical condition or when an offender is an inpatient. In these circumstances the DOC will provide the necessary medication.

If any offenders at a facility wish to have other over the counter preparations included on the attached list, the facility is to contact the Central Office Health Care Services Staff prior to purchasing the new item. The Central Office Health Care Services Staff shall review the request and ensure that the preparation is safe and effective. The inclusion of additional over-the-counter preparations shall not substitute for the listed required over-the-counter preparations.

Facility Heads may develop procedures which will allow indigent offenders to have access to the indicated items through the offender commissary. However, it shall not

be necessary to provide these items to indigent offenders.

Any questions regarding this Executive Directive may addressed to either Mr. Dean Neitzke, Director/Health Care Services, at (317) 232–5717, or Mr. Michael Pavese, Policy Manager, at (317) 232–5750.

attachment

/s/ Christian DeBruyn
H. CHRISTIAN DeBRUYN
Commissioner

## OVER THE COUNTER MEDICATIONS

Effective June 15, 1993, the Department of Correction's Health Care Services staff will no longer provide you with over the counter medications used for cosmetic, general hygiene or convenience purposes. Rather, this type of preparation will be available to you for purchase in the Offender Commissary.

This change in procedure will bring our practice more into line with the way these preparations are used outside the prison setting. These items are not purchased through the health care delivery system. This procedure also recognizes that these medications are not generally used as necessary medical treatment for serious medical conditions.

The Offender Commissary will be making strenuous efforts to ensure that these items are available at a reasonable cost.

Health Care staff members have been instructed that they are no longer permitted to provide you with these items. Please do not request them from the Health Care staff.

The preparations that will be in the Offender Commissary are:

Balanced liquid antacid

Psyllium seed laxative

Chlorpheniramine maleate, 4 mg

Diphenhydramine, 25 mg

Pseudoephedrine, 30 mg

Aspirin, 5 grain

Acetaminophen

Ibuprofen, 200 mg

Benzoyl peroxide, 5% (gel or liquid)

Moisturizing Hand and body lotion, any brand

Dandruff shampoo

Tolnaftate cream, 1%

Sun screen with SPF at least 15

Hemorrhoidal cream with hydrocortisone

Hydrocortisone, .5% cream or ointment

Mildly abrasive callous sponge

Saline nasal spray

Artificial tears

Multivitamin tablet, any general purpose

On rare occasions, one or another of these preparations may be used by Health Care staff to treat a serious medical condition. If this situation occurs, the medications will be provided to you by the Department of Correction.

## EXHIBIT B

### INDIANA DEPARTMENT OF CORRECTION

Health Care Services Directive

Number: HCS–93–7

Date: 5/17/93

Supersedes: NEW

TITLE: ACCESS TO CARE

PURPOSE:

Offenders have a constitutionally guaranteed right to health care services necessary for the treatment of serious medical conditions. This Health Care Services Directive describes the process through which this care may be requested by offenders.

OBJECTIVE:

This document describes the process through which health care services may be requested by offenders. Depending upon the urgency of the health care need, health services must be available either immediately or on a scheduled basis. This document provides a structure through which access to care can be provided in a timely fashion while permitting correctional health care professionals to see patients based upon a need based priority.

GUIDELINES:

1. Definitions

   a. Medical Emergency—A serious medical problem, usually presenting unexpectedly, which can lead immediately to loss of life or limb, or other serious morbidity; no delay in provision of services is acceptable.

   b. Medical Urgency—A serious medical problem, usually presenting unexpectedly, which can lead to loss of life or limb if not quickly addressed; generally a delay of hours is acceptable in an urgent situation.

   c. Medical Necessity–Routine—A serious medical problem which can be addressed days or weeks in the future; a delay in response does not affect eventual outcome.

   d. Convenience Care—A trivial condition for which an offender desires health care services, but which does not rise to the level of a serious medical need requiring treatment; it is not necessary to provide this type of treatment to offenders.

   e. HCRF—A health care request form utilized to request health care services. State Form 45913, "Request for Health Care," shall be used for this purpose.

   f. Sick Call—The face to face evaluation of a first level complaint, generally by a nurse, whether on a scheduled or emergency basis.

2. Introduction

   Offenders have a constitutional right to receive necessary health care services for serious medical problems. In order to meet this need, the Department's health care services must permit unimpeded access to care while maintaining clear control over the health care delivery process.

   Access to health care services should be relatively free of barriers and should not come under the control of staff members who are not part of the health care delivery team. Health care staff must retain the authority to determine medical priorities and to use this prioritization to provide emergency services emergently, urgent services urgently, and routine services routinely. The process must also permit health care staff to determine which services are "convenience care" and to indicate that to the involved offenders or interested staff members.

   Traditional "sign up" processes are not adequate in prison settings because they tend to be public, permitting not only officers access to listings of the individual offender's concern, but also permitting other offenders to see what has been written on the list. Additionally, sign up systems remove control from the health care professionals and give it to the offenders; offenders control the patient flow and scheduling process. Appointment systems based upon health care request forms (HCRFs) permit health care staff to regain and keep control of access to care and permit prioritization of services based upon the stated need for care.

   In addition to the use of written HCRFs, any reliable system must also permit immediate access when medical emergencies or medical urgencies occur. When either of these present (whether by direct phone call, conversation with staff member or offender, or recognition after review of a kite), services must be immediately available.

3. Health Care Request Forms

   A standardized HCRF shall be used in all facilities. The form includes two major sections. The first section is for use by the offender and includes offender identification information, a check-off area in which the offender can indicate the general category of the inquiry or request, an area in which the offender can provide a narrative describing his or her concern, and a space for the offender to place a signature and date. The second section is for use by health care providers; it includes an area in which the reviewer can write a few words or lines to indicate what response is being made (for example, an appointment, return of some information, advice to go to the commissary, etc.) and an area for the provider to place a signature and date.

HCRF's should be kept available in all housing areas and made available to offenders upon request. Illiterate offenders should be offered assistance in completing the form, preferably, but not necessarily by a health care staff member.

Each facility must establish secure drop boxes to receive completed HCRFs. Drop boxes must be available to offenders so that they can place HCRFs directly into them without first giving them to officers. Health care staff should retrieve HCRFs from each drop box at least once every business day.

In segregation settings, HCRFs should be handed directly to nursing staff while they are performing segregation unit rounds. Health care staff should review each HCRF, preferably within one business day. Forms that lack identification data should be thrown away. Forms lacking adequate information should be returned to the offender for resubmission, provided the information already presented does not suggest an urgent or emergent health care need. Health care staff reviewing the HCRFs should indicate on the return section of the form what action will be taken, and should forward the return section of the form to the offender.

If further action is necessary (a health care visit, a search for additional information, etc.) the HCRF should be retained by being temporarily attached to the health record. Once action related to the HCRF is completed, the form may be thrown away.

Based upon the information provided in the HCRF, appointments may be scheduled. Generally, the appointment will be with nursing staff for the purpose of screening. Appointments need not be scheduled "immediately" unless the problem warrants it.

4. Medical Emergencies and Medical Urgencies

Urgent and emergent medical situations may develop and present at any time. Health care staff need to be prepared to respond to those with urgent or emergent health care needs at any time, 24 hours a day, 7 days a week. Health care staff also need to be willing to respond to urgent or emergent situations no matter how they learn of them. Similarly, offenders need to understand that the HCRF based system does *not* restrict access for emergent situations, and staff from other areas of the prison need to understand that they should inform health care staff whenever a possible medical emergency or urgency presents itself.

Health care staff should assess the situation, as well as may be possible, using all available information, including (when possible) the offender's health record, and plan their response accordingly. In the extreme case, emergency care should be provided immediately.

Information regarding medical emergencies and urgencies can be transmitted to health care staff in any of the following ways:

a. HCRF received routinely describes a problem which is actually urgent or emergent;

b. A verbal report from an offender (either the one who is ill or one who observed him or her) describes what may be an urgent or emergent situation;

c. A verbal report from any staff member who has received information from other staff members or from offenders that is consistent with an urgent or emergent situation; or,

d. A report based upon information received from a non-prison source, such as a family member or attorney.

The response to a possible emergent or urgent situation must depend upon the patient's condition and not upon the manner in which the information is received. On occasion a disruptive offender may be demanding emergent care unnecessarily; or, staff in a prison area may be concerned and panicky regarding a possible medical emergency. In order to preserve facility security, occasionally, it may be prudent to respond as if a situation is urgent, even if it is clear to health care staff that it is not. This type of response can help to preserve

facility stability. However, events of this type must be few and far between, and must be followed by an educational process to insure that involved housing, custodial, or other facility staff are educated regarding the situation so that similar episodes are less likely to occur.

5. Appointments for Routine Care

Each facility must devise an appointment system that schedules offenders to be seen by appropriate types of staff members. The scheduling should provide service to the most urgent patients first, in a first come first served sequence.

Appointments should be handled as mandatory "call outs," with offenders who do not arrive on time being considered "out of place" and with appropriate disciplinary action following. Offenders who are "no show" should also be considered "out of place." Health care staff should evaluate the purpose of the health care visit for which the "no show" occurred and determine, based upon medical need, whether or not to reschedule the offender. The decision regarding rescheduling the offender should be documented in the health record.

Offenders should be scheduled in a manner that insures that the offenders are likely to have short waits; it is inappropriate to space patients far enough apart to avoid any wait at all; this will cause the provider to have to wait between patients.

Offenders do not have the right to specify which type of provider or which staff member they see. If an offender refuses to be seen by the staff member to whom he or she is scheduled, that should be handled as a refusal to receive health care services and documented as such. All offenders refusing health care services should be offered a release of responsibility to sign.

(Offenders who wish to refuse to be seen may *not* refuse without appearing. It is inappropriate for facility staff other than health care professionals to accept the refusal to be seen, and it is impossible to obtain a signed release unless the offender is seen by health care staff.)

Offenders who repeatedly request unnecessary services do not need to be scheduled repeatedly. Refusing to schedule an offender for convenience care, for services already provided, or for services which are not provided is acceptable. When no appointment is provided, the offender should be informed both of the decision and the reasoning behind it. Care must be taken in order to avoid excluding from evaluation new problems when they develop.

6. Convenience Care

Convenience care includes cosmetic services, hygiene items, cold preparations, most allergy care, tattoo removal, and many other interventions. Some of these interventions are medically appropriate, but do not rise to the level of being serious medical needs. Others are not even "medical," although they have fallen under control of health care professionals.

No convenience care should be provided by the health care staff in outpatient settings. It is critical to our "group practice" that we be consistent with each other in refusing to provide convenience care; if we undermine each other, the offenders will become angry and dissatisfied; line staff will end up at each other's throats.

In inpatient settings, it is crucial that we control all medications being used by offenders, including legend and over the counter preparations. In inpatient settings, it is acceptable to provide over the counter hygiene items that would not be provided in outpatient settings; otherwise, we cannot control which medications our inpatients use. Cosmetic and other care that is neither serious nor medically necessary should not be provided in inpatient settings.

7. Sick Call Settings

The face to face evaluation (generally by nursing staff) called "sick call" should take place in an acceptable environment. In order to provide proper screening and treatment services, the sick call area should provide:

a. Adequate security (no isolation by both sight and sound, and, in high security settings, the presence of custodial staff);

b. Adequate space and equipment;

c. Adequate lighting;

d. Handwashing facilities or a satisfactory substitute; and,

e. Easy access to health records.

8. Use of the Medical Record

All health care services, including sick call and related triage services, should be documented in the health record. To facilitate this, the health record should be easily available to those staff seeing offenders. Even in segregation settings, it is possible to create process that permit contemporaneous charting in a convenient manner. It is not possible to be confident about a medical intervention unless the existing health record data is considered in the process.

9. Service Efficiencies

Provision of health care services to offenders should be considered one of the highest facility priorities. Inordinate delays in patient movement should not be accepted. Professional health care staff should be able to work efficiently and rapidly. Offenders should wait to be seen rather than having staff members wait for offenders.

In some situations, it may be possible to see patients even during count times. Each facility should examine its patient population and determine whether or not any segments can be seen during count periods. For example, it may be possible and even desirable to see protective custody patients during count periods.

It is inappropriate for other scheduled activities to "bump" health care activities. Coordination and cooperation in the local administration can almost always prevent conflicts in scheduling service delivery.

10. Illiteracy and Language Difficulties

Illiterate offenders will need assistance in requesting health care services. Offenders identified as illiterate should have access individualized. Some may need some assistance in completing HCRFs and others may need to have periodic inquiry made of them by health care staff.

Those offenders without command of English may need translation services. Facilities should identify offenders who do not speak English well enough to permit adequate service delivery and individualize their responses to insure that necessary health care services can be delivered.

11. Applicability

This Health Care Services Directive is applicable to all confined offenders and to all Department facilities.

ATTACHMENTS:

"Request for Health Care," State Form 45913

RELATED STATUTES/POLICIES/DIRECTIVES:

| | |
|---|---|
| IC 11–10–3–1 | mandates medical care standards for committed persons |
| IC 11–10–3–4 | mandates the Department to establish directives governing the delivery of medical services. |
| 01–02–101 | "The Development and Delivery of Medical Services" |
| 01–02–102 | "The Development and Delivery of Mental Health Services" |
| 01–02–103 | "The Development and Delivery of Dental Health Services" |
| 01–02–104 | "The Development and Delivery of Vision, Hearing and Speech Care |
| 01–02–105 | "The Development and Delivery of Pharmaceutical Services" |

/s/ W. Dean Neitzke
    Director, Health Care Services

5–19–93

Date